Leonard H. GARRETT, Appellant,

v.

Elliot L. RICHARDSON, Secretary of
Health, Education and Welfare,
Appellee.

No. 72–1141.

United States Court of Appeals,
Eighth Circuit.

Dec. 27, 1972.

J. D. Riffel, Kansas City, Mo., for appellant.

Stanton R. Koppel, Atty., Appellate Section, Dept. of Justice, Washington, D. C., for appellee.

Before HEANEY and STEPHENSON, Circuit Judges, and BOGUE,* District Judge.

BOGUE, District Judge.

Leonard H. Garrett applied for Social Security disability benefits under 42 U. S.C. §§ 416(i), 423, on May 7, 1970, claiming that he had been unable to work since November 7, 1969. The claim was denied on August 17, 1970, and on reconsideration, the original denial .was affirmed. On December 14, 1970, Garrett filed a request for hearing, which was held on February 11, 1971. On February 25, 1971, the hearing examiner entered his order denying the claim. Plaintiff then appealed to the Appeals Council who declined review, adopting the hearing examiner's opinion. By complaint filed in the United States District Court for the Western District of Missouri, Garrett sought to overturn this "final decision" by the Secretary of Health, Education and Welfare. Upon Motions for Summary Judgment by both parties, the district court,

337 F.Supp. 877, concluded that substantial evidence existed in the record to support the administrative determination. This appeal followed.

Appellant, who was fifty-nine years of age at the time he became unable to work, is married with no children. After attending third grade, he worked at various odd jobs, the majority of which involved hauling wood, until his entrance into the army in 1942. After five months and a slow recovery from a hemorrhoid operation, appellant received a disability discharge from the army, whereupon he again engaged in odd jobs, hauling wood. On August 29, 1950, appellant commenced work with the Missouri Portland Cement Company, first as a laborer, later as a carpenter, and had reached the level of head carpenter earning $4.36 per hour when he became unable to work.

On November 9, 1969, after having sneezed or coughed, appellant started bleeding profusely through his mouth and nostrils. He was placed in a hospital on that date where he remained for five days. Appellant has not returned to work since November 7, 1969.

This Court has repeatedly set out the legal standards applicable to appeals of this kind, commencing with Celebrezze v. Bolas, 316 F.2d 498, 500–501 (8th Cir. 1963), and thereafter in Celebrezze v. Sutton, 338 F.2d 417 (8th Cir. 1964); Brasher v. Celebrezze, 340 F.2d 413, 414 (8th Cir. 1965); Marion v. Gardner, 359 F.2d 175, 179–180 (8th Cir. 1966); Nichols v. Gardner, 361 F. 2d 963, 964 (8th Cir. 1966); and Easttam v. Secretary of Health, Education and Welfare, 364 F.2d 509, 511 (8th Cir. 1966). Those standards are:

" * * * (a) the claimant has the burden of establishing his claim; (b) the Act is remedial and is to be construed liberally; (c) the Secretary's findings and the reasonable inferences drawn from them are conclusive if they are supported by substantial evidence; (d) substantial evidence is such relevant

* Sitting by designation, District of South Dakota.

evidence as a reasonable mind might accept as adequate to support a conclusion; (e) it must be based on the record as a whole; (f) the determination of the presence of substantial evidence is to be made on a case-to-case basis; (g) where the evidence is conflicting it is for the Appeals Council on behalf of the Secretary to resolve those conflicts; (h) the statutory definition of disability imposes a three-fold requirement (1) that there be a medically determinable physical or mental impairment which can be expected to [result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months],[1] (2) that there be an inability to engage in any substantial gainful activity, and (3) that the inability be by reason of the impairment; (i) such substantial gainful activity is that which is both substantial and gainful and within the claimant's capability, realistically judged by his education, training, and experience; (j) the emphasis is on the particular claimant's capabilities and on what is reasonably possible, not on what is conceivable; and (k) it is not the duty ·or the burden of the Secretary to find a specific employer and job for the claimant but, instead, some effort and some ingenuity within the range of the claimant's capacity remains for him to exercise." Brasher v. Celebrezze, supra, 340 F.2d at 414.

The controlling evidence in this case is that adduced before the hearing examiner. That evidence consisted of a medical report dated January 19, 1967, directed to the General American Life Insurance Company, St. Louis, Missouri, covering an examination by W. W. Woodward, M. D.; a medical report dated February 11, 1970 by Dr. Woodward; a medical report by L. W. Higgins, D. O., dated May 15, 1970; a medical report dated September 24, 1970 by L. A. Hollinger, M. D.; a medical report by Carleton J. Lingren, M. D., dated Oc-

tober 9, 1970; the various hospital records of the claimant; and the sworn testimony of appellant and appellant's wife before the hearing examiner.

Dr. Woodward, in his first examination of the appellant in 1967, made the following diagnosis:

"1.   Chronic bronchitis.

2.   Bronchospasm, secondary to number one with moderate dyspnea on heavy exertion.

3.   Peripheral vascular disease with mild intermittent claudication.

4.   Psychophysiologic reaction with anxiety syndrome."

Dr. Woodward concluded:

"To the best of my ability to discern the patient's condition at this moment, I would not feel that he is totally disabled.   It is certain that he has some limitation of heavy activity on the basis of his peripheral vascular disease and his bronchitis.   I do not think Mr. Garrett is intentionally malingering, but feel that he is thoroughly convinced that his medical problems are of greater severity than can be measured objectively and it (sic) concerned about the above-mentioned symptoms.   I can really see no objective reason why Mr. Garrett could not be gainfully employed, at least in a light to moderate job situation."

Three years later and after appellant had ceased working, Dr. Woodward again examined appellant.   After diagnosing recurrent and chronic bronchitis, the doctor stated:

"It is very difficult to judge just how incapacitated Mr. Garrett is.   He has a quite evident recurrent and chronic bronchitis.   He has very minimal evidence of air trapping, but no evidence of genuine emphysema of any real significance.   He is subjectively, however, incapacitated; and, I am sure that he certainly considers himself unable to work without conscious maling-

1.   1965 Amendment to the Social Security Act substituted "or has lasted or can be expected to last for a continuous period of not less than 12 months" for "or to be of long-continued and indefinite duration."   P.L. 89–97, § 303(a)(1).

ering. The lab evaluation disclosed very little in the way of objective abnormality. The major findings are the retardation of his expiratory flow rate and relatively low first second vital capacity. While we see many people with pulmonary function studies worse than this, who are able to work, the subjective component of this illness is always prominent and the degree of respiratory insufficiency that he has is subjectively crippling to him.

I rather doubt that Mr. Garrett will be able to return to full-time employment in the sense of his feeling able to discharge the usual duties of his work. He objectively has sufficient evidence of disease to document abnormalities in the respiratory system. He has moderate evidence of peripheral vascular disease which is probably contributory. I believe he is a rather dependent personality and tolerates discomfort of various sorts rather less well than the average individual. With his personality type and these abnormalities in mind, I would suggest that he be placed on early retirement."

It should be noted that both of the examinations by Dr. Woodward were not made for the purpose of appellant's claim for disability benefits.

Appellant's personal physician, Dr. L. W. Higgins, in a report dated May 15, 1970, diagnosed Garrett's condition as emphysema, fibrosis and hemoptysis. This was the same diagnosis that Dr. Higgins made in November, 1969 when appellant was admitted to the hospital after having coughed up blood. The hospital records attached to the May 15 report included an X-ray report dated November 10, 1969, which indicated "emphysema in the upper lobes, gross thickening in the hilar areas and calcification in the hilar areas," and the possibility of silicosis. Dr. Higgins thus concluded, in a letter dated December 16, 1970, that "[d]ue to his physical condition I feel he is unable to work and have recommended retirement."

For the purpose of investigating appellant's claim, appellee selected Dr. L. A. Hollinger of Kansas City, Missouri to examine appellant. In a report dated September 24, 1970, Dr. Hollinger stated:

"In summary, this patient does have a history compatible with chronic bronchitis with only the presence of minimal airways obstruction. He does describe episodes of acute bronchitis but these are very minimal and infrequent. There is no evidence at this time to substantiate a diagnosis of pulmonary emphysema. According to the A.M.A. Expert Committee for the rating of respiratory impairment this patient would be placed in class 1, or zero impairment. There would appear to be a considerable functional component to his complaint of dyspena and it is not substantiated by either pulmonary or cardiovacular studies. I can therefore find no reason to place any restrictions on this patient's physical activities. His prognosis would appear to be good as far as his cardio-pulmonary status is concerned. It is my feeling that this patient should become more active, lose weight, and, in turn, should note improvement in his complaints. At the present time there is no obvious reason why this patient could not be employed."

Dr. Carleton J. Lindgren, a psychiatrist, was also retained by appellee to examine appellant. He concluded that appellant suffered from no psychiatric illness and was not in need of psychiatric care.

These reports by the various physicians concluded the medical evidence. Only two persons were called to testify before the hearing examiner—the appellant and his wife

Appellant testified that due to weakness in his legs and shortness of breath, he was unable to work. With respect to his claim of arthritis, the following testimony was elicited:

Q. Mr. Garrett, in your application for disability benefits you claimed

your physical impairment or your medical problem was arthritis of the spine, emphysema, and bronchial asthma. Those are the three things the lady wrote down when you talked with her and applied for disability. When did you first think you had arthritis of the spine?

A. I've had arthritis of the spine for several years.

Q. When did any doctor ever tell you? Do you know?

A. No, I don't remember just when it was.

Q. Did some doctor tell you you had arthritis of the spine?

A. Higgins said I had arthritis which wasn't—I swell up every once in a while. He said it wasn't—you know, this crippling—

Q. Not crippling, huh?

A. After all, it isn't giving me anything that way, but boy, it's giving me fits. My legs hurt so bad at night.

\* \* \* \* \* \*

Q. Do you have any pain in your back that you think is due to arthritis?

A. Yes, I do. I have.

Q. How often?

A. Well, this is just—well, this just stays with me about all the time, and I have only one kidney.

Q. Well, we will get to that in a minute. Do you have—Did you say you have swelling in your knees or legs or hands or anywhere?

A. All that swelling in my ankles and the—

Q. How often do you have swelling in your ankles?

A. And then that—well, they just swell up and stay swelled up, and then my face, too, and I—he gave me some medicine, and I taken it. It pretty well taken the swelling out of my ankles, but the swelling—it doesn't seem like it goes out of my face. It doesn't seem like it helped it much."

Appellant's wife further testified that her husband complains about his knees and legs and back hurting, and that she observed him being short of breath three or four times a day.

Now, then, of what significance are these medical reports and testimony under the standards previously set out for determining disability benefits under the Social Security Act? Their significance lies primarily in the fact that, although there is conflicting evidence as to exactly *what* medical impairment appellant suffers, there is absolute agreement from the testimony and exhibits that appellant *does suffer* from *some* impairment. On the other hand, with one exception, the record is deplete of any evidence that the impairment which appellant suffers, whether it be emphysema, chronic bronchitis, or arthritis, is sufficient to limit appellant's ability to perform substantial gainful activity. The exception is with respect to Dr. Higgins' statement that appellant could not work at all.

Dr. Woodward, whose reports the hearing examiner relied upon partly, stated, "I can really see no objective reason why Mr. Garrett could not be gainfully employed, at least in a light to moderate job situation." But such a statement does not conform to the statutory standard of performing substantial gainful activity.

"Once proper medical evidence, buttressed by subjective evidence from claimant has shown a sufficiently severe impairment, it must be determined if such impairment, plus claimant's educational and work status, preclude any substantial, gainful activity. Blankenship v. Ribicoff, 206 F.Supp. 165 (S.D.W.Va.1962). In cases of this kind, where the claimant alleges inability to engage in substantial, gainful activity, and his personal physician, the man in whose charge claimant has entrusted his health, claims likewise, if examining physicians are to dispute

this contention, they must give the medical basis for their opinions. It is not sufficient to say that a man suffers some form of physical impairment yet can do 'light work.' It must be shown medically that he can perform the physical activities certain jobs require without serious aggravation to present physical impairment or to general health. Otherwise, the Hearing Examiner's findings would amount to pure speculation."

Clemochefsky v. Celebrezze, 222 F.Supp. 73, 78 (D.C.Pa.1963); Floyd v. Finch, 441 F.2d 73, 83 (6th Cir. 1971). *See* Massey v. Celebrezze, 345 F.2d 146, 157 (6th Cir. 1965).

■■■■ From a thorough examination of the record, it is readily apparent that the hearing examiner was almost exclusively concerned with the medical diagnosis of "disability", as that term is used by the medical profession. But a "medical disability" and a "disability" that qualifies for benefits under the Social Security Act are not necessarily synonymous. As the term is defined in 42 U.S.C. § 423(d)(1), "disability" means "inability to engage in any substantial gainful activity by reason of *any* medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." (Emphasis added). Therefore, unless *substantial evidence is adduced bearing* on the ability of the claimant to perform *substantial gainful activity*, the statutory standard for either proving or disproving "disability" has not been met. And "substantial gainful activity" means just that—the activity must not only be "gainful", it must be "substantial". "A light to moderate job situation", as that phrase was used by Dr. Woodward, or "there is no obvious reason why this patient could not be employed," as stated by Dr. Hollinger, are simply statements too general in nature to be acceptable under the substantial evidence rule as proving ability to engage in substantial gainful activity. In

so holding, we are not unmindful of this Court's holding in Miller v. Finch, 430 F.2d 321, 323–324 (8th Cir. 1971), wherein it was reiterated that the burden of proof is upon the claimant to establish his right to disability benefits and that the burden does not shift. However, "the determination of the presence of substantial evidence is to be made on a case-to-case basis." Brasher v. Celebrezze, supra. Moreover, "the examiner has the responsibility of inquiring into the claims asserted by the claimant in a manner that will *fully* and *fairly* develop the facts." Sellars v. Sec. of H.E.W., 458 F.2d 984, 986 (8th Cir. 1972). In *Miller*, a vocational expert testified at both hearings that, after considering the claimant's age, work experience and educational background, there were jobs existing in the national economy which the claimant could perform. No expert in vocational training was ever called to testify in this case, nor was any report submitted, nor was any testimony elicited concerning what type of "light or moderate work" appellant could perform with *his* education, *his* age and *his* work experience that would be commensurate with substantial gainful activity. In such circumstances, it cannot be said that a finding of no disability is supported by substantial evidence. While the burden is upon the claimant to establish his disability, once medical reports have been introduced substantiating a medical impairment, and the claimant having testified that he is unable to work, it would be beyond the realm of reason to further require a claimant, who is not represented by an attorney, who is sixty years of age with a third-grade education, and who if not financially distraught, would not be asserting a claim for benefits in the first place, to produce a vocational counselor to testify that there are no jobs in the national economy which he can perform. The burden of producing such a person must rest with the hearing examiner and in the absence of substantial evidence from other sources bearing direct-

ly on the issue of "substantial gainful activity," the testimony of a vocational counselor is essential for the affirmance of an examiner's findings.

The circuit courts are already overburdened by cases on appeal[2] without having to correct every examiner's decision for the misuse or complete disregard of correct standards in cases such as this. Judge McAllister stated in a recent Sixth Circuit Opinion:

"It used to be easy enough for an appellate court to affirm an administrative agency on the ground that the findings were supported 'by substantial evidence,' if it could find just a trace of evidence to support them. But that is not the case anymore. Congress grew critical of such affirmances which ignored conflicting evidence and, in turn, brought about harsh criticism of the courts for such decisions on the ground that cases were affirmed merely because the appellate court could find evidence in the record which, viewed in isolation, substantiated a Board's findings." Floyd v. Finch, 441 F.2d 73, 76 (6th Cir. 1971).

The courts have been well aware of this Congressional attitude as evidenced by the number of reversals and remands of the Secretary's decisions in recent years. Nevertheless, the plethora of judicial fidelity to the Congressional desire that courts assume more responsibility for the reasonableness and fairness of administrative decisions has apparently led to placid procrastination —"passing the buck", if you will—on the part of hearing examiners. Relying on the shield of the substantial evidence rule, little or no evidence is adduced on the major issues for determination, with the result that incomplete findings are made and incorrect standards applied.

Accordingly, this case is remanded to the Secretary for further findings not inconsistent with this opinion.

Remanded.

2. Rowland F. Kirks, Director of the Administrative Office of the United States Courts, in a report presented to the annual meeting of the Judicial Conference of the United States, stated that during fiscal year 1972 case filings in the courts of appeal rose 14 percent over the previous year and despite a record number of dispositions, cases pending in the courts of appeal increased eight percent. Release of October 31, 1972.